

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-15-00033-CV
_____

IN THE INTEREST OF J.F., J.L., AND J.N., CHILDREN

On Appeal from the 196th District Court
Hunt County, Texas
Trial Court No. 80884

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Burgess

## MEMORANDUM OPINION

DeDe's[1] drug use, petty thefts, and incarcerations eventually resulted in the termination of her parental rights to her five children.[2]  In this case, she appeals the trial court's order terminating her parental rights to J.F., J.L., and J.N.  She contends that the evidence is legally and factually insufficient to support the trial court's findings that she (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being, (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical and emotional well-being, and (3) failed to comply with the provisions of a court order that specifically established the actions necessary to obtain the return of the children who had been in the temporary managing conservatorship of the Department of Family and Protective Services (the Department) for not less than nine months as a result of their removal under Chapter 262 of the Texas Family Code due to alleged parental abuse or neglect.  *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O) (West Supp. 2015).  DeDe also contends that the evidence is legally and factually insufficient to support the trial court's findings that termination was in the children's best interests.  *See* TEX. FAM. CODE ANN. § 161.001(b)(2) (West Supp. 2015).  We affirm the trial court's judgment because we find (1) that sufficient evidence supports at least one finding of a statutory ground for termination of DeDe's

---

[1]We refer to the children by their initials and to the parents by fictitious names to protect the privacy of the children. *See* TEX. FAM. CODE ANN. § 109.002(D) (West 2014).

[2]Although tried together, DeDe's rights to her other two children, J.E.N. and J.H.N., were also terminated under a separate cause number.  Her appeal from that termination order is the subject of a separate opinion issued this same date under cause number 06-15-00034-CV.  Since these matters were tried together and the evidence presented at trial was relevant to both matters, we will fully set forth all evidence relevant to both of these appeals in this opinion.

parental rights to the children and (2) that sufficient evidence supports the trial court's finding that termination was in the best interests of the children.

## I.     Sufficient Evidence Supports Termination of DeDe's Parental Rights Under Section 161.001(b)(1)(E)

### A.     Standard of Review

"Texas courts show great respect for the biological bond between parent and child, recognizing that the '"natural right which exists between parents and their children is one of constitutional dimensions." *In re O.R.F.*, 417 S.W.3d 24, 35 (Tex. App.—Texarkana 2013, pet. denied) (quoting *In re J.W.T.*, 872 S.W.2d 189, 194–95 (Tex. 1994) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.—Texarkana 1995, writ denied). "Consequently, termination proceedings are strictly construed in favor of the parent." *In re A.T.*, No. 06-14-00091-CV, 2015 WL 733275, at *1, (Tex. App.—Texarkana Feb. 18, 2015, no pet.); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. Crim. App. 2012); *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex. 1985); *In re S.K.A.,* 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied). "However, we also recognize that '"the rights of natural parents are not absolute; protection of the child is paramount. . . .  The rights of parenthood are accorded only to those fit to accept the accompanying responsibilities."' *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). The child's emotional and physical interests will not be sacrificed merely to preserve parental rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

"Terminating parental rights under the Family Code requires proof by clear and convincing evidence." TEX. FAM. CODE ANN. § 161.001(b) (West Supp. 2015).  Clear and convincing evidence is '"proof that will produce in the mind of the trier of fact a firm belief or conviction as

to the truth of the allegations sought to be established.'" *Id.* (citing TEX. FAM. CODE ANN. § 101.007 (West 2014); *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002)). "In reviewing legal sufficiency, we "'look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.'" *Id.* (quoting *J.F.C.*, 96 S.W.3d at 266). "When the trial court is the fact-finder, 'we assume that the trial court resolved disputed facts in favor of its finding if a reasonable fact-finder could do so, but disregard all evidence that a reasonable fact-finder could have disbelieved or found to have been incredible.'" *Id.* (quoting *In re K.W.*, 335 S.W.3d 767, 770 (Tex. App.—Texarkana 2011, no pet.) (citing *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009)).

"In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). "We consider only that evidence the fact[-]finder could reasonably have found to be clear and convincing and determine "'whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction about the truth of the . . . allegations.'" *Id.* (quoting *H.R.M.*, 209 S.W.3d at 109). We "disregard all evidence that a reasonable fact-finder could have disbelieved," but we also consider "undisputed evidence even if it is contrary to the finding." *In re N.S.G.*, 235 S.W.3d 358, 364 (Tex. App.—Texarkana 2007, no pet.) (citing *J.F.C.*, 96 S.W.3d at 266). "If, in light of the entire record, the disputed evidence that a reasonable fact[-]finder could not have credited in favor of the finding is so significant that a fact[-]finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *J.F.C.*, 96 S.W.3d at 266. In our determination, we make "'an exacting review of

4

the entire record with a healthy regard for the constitutional interests at stake.'" *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (quoting *C.H.*, 89 S.W.3d at 26). "[I]f the fact-finder could have reasonably resolved the conflicts in the evidence and formed a firm conviction that the State's allegations were true, then the evidence is factually sufficient and the termination findings must be upheld. *A.T.*, 2015 WL 733275, at *2 (citing *C.H.*, 89 S.W.3d at 18–19.).

"Only one predicate finding under [Section 161.001(b)] is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re O.R.F.*, 417 S.W.3d at 37 (citing *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re K.W.*, 335 S.W.3d 767, 769 (Tex .App.—Texarkana 2011, no pet.); *In re N.R.*, 101 S.W.3d 771, 775 (Tex. App.—Texarkana 2003, no pet.)). If the trial court finds multiple predicate grounds, we will affirm the trial court's judgment if the evidence is legally and factually sufficient to support termination on at least one statutory ground and a finding that termination was in the best interests of the children. *See In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.); *K.W.*, 335 S.W.3d at 769. The trial court found that DeDe engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical and emotional well-being of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E).

Parental rights may be terminated if the parent has "[e]ngaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endangers the physical or emotional well-being of the child[ren]." TEX. FAM. CODE ANN. § 161.001(b)(1)(E).

"'Endanger'. . .'means to expose to loss or injury . . . .'" *N.S.G.*, 235 S.W.3d at 367 (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "It is not

necessary that the conduct be directed at the child or that the child actually suffer injury. Under subsection (E), it is sufficient that the child's well-being is jeopardized or exposed to loss or injury." *In re L.E.S.*, No. 06-15-00015-CV, 2015 WL 4914743, at *5 (Tex. App.—Texarkana Aug. 18, 2015, no pet. h.) (citing *Boyd,* 727 S.W.2d at 533; *N.S.G.,* 235 S.W.3d at 367). "Further, termination under subsection (E) must be based on more than a single act or omission. Instead, a 'voluntary, deliberate, and conscious course of conduct by the parent is required.'" *Id.* (quoting *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.)).

In *C.A.J.*, we explained the type of evidence necessary to support a finding under subsection E:

> Subsection E "'refers only to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act.'" *N.S.G.,* 235 S.W.3d at 366–67 (quoting *In re S.K.,* 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied)). "'The conduct to be examined includes what the parent did both before and after the child was born.'" *Id.* at 367 (quoting *S.K.,* 198 S.W.3d at 902); *see E.N.C.,* 384 S.W.3d at 804–05. "'To be relevant, the conduct does not have to have been directed at the child, nor must actual harm result to the child from the conduct.'" *In re Z.M.*, 456 S.W.3d 677, 686 (Tex. App.—Texarkana 2015, no pet.) (quoting *Perez,* 148 S.W.3d at 436); *see E.N.C.,* 384 S.W.3d at 803; *N.S.G.,* 235 S.W.3d at 367. "However, termination under this ground 'must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.'" *Z.M.,* 456 S.W.3d at 686 (quoting *Perez,* 148 S.W.3d at 436).
>
> "'Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001(1)(E).'" *In re A.L.,* 06-14-00050-CV, 2014 WL 5204888, at *7 (Tex. App.—Texarkana Oct. 8, 2014, no pet.) (mem. op.) (quoting *Walker v. Tex. Dep't of Family & Protective Servs.,* 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)). "'Drug use and its effect on a parent's life and his ability to parent may establish an endangering course of conduct.'" *In re J.L.B.,* 349 S.W.3d 836, 848 (Tex. App.—Texarkana 2011, no pet.) (quoting *N.S.G.,* 235

6

S.W.3d at 368); *see In re J.O.A.,* 283 S.W.3d 336, 345 n. 4 (Tex. 2009) ( "'Evidence of illegal drug use or alcohol abuse by a parent is often cited as conduct which will support an affirmative finding that the parent has engaged in a course of conduct which has the effect of endangering the child.'") (quoting *In re S.N.,* 272 S.W.3d 45, 52 (Tex. App.—Waco 2008, no pet.)).

*C.A.J.*, 459 S.W.3d at 181–82. In addition, "[w]hile we recognize that imprisonment, standing alone, is not conduct which endangers the physical or emotional well-being of the child, 'intentional criminal activity which expose[s] the parent to incarceration is relevant evidence tending to establish a course of conduct endangering the emotional and physical well-being of the child.'" *L.E.S.*, 2015 WL 4914743, at *5 (quoting *In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.) (per curiam) (citing *Allred v. Harris Cnty. Child Welfare Unit*, 615 S.W.2d 803, 806 (Tex. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.))).

## B.     The Evidence

At trial, DeDe testified that she gave birth to her oldest child, J.F., when she was sixteen years old. She also testified that each of her children has a different father, generally resulting from very short-lived relationships. At the time they were removed from her custody in July 2014, the children ranged in ages from seven years to five months old. DeDe related two incidents of abuse that precipitated the Department's involvement. She testified that in April 2014, she and her children began living with Jimmy,[3] the father of her third child, J.N. Shortly after moving in together, Jimmy became jealous and angry, began pushing her around, and was emotionally abusive. Near the end of June, DeDe was sleeping with her four-month-old baby, J.H.N., when

---

[3]Jimmy had gotten out of prison the previous December.

Jimmy grabbed the baby, spat on him, laid him on the floor, and began urinating on him. When she tried to intervene, Jimmy jumped on her, dragged her to their bedroom, and started beating her and stomping on her. DeDe's left pinkie finger was broken, and her right wrist was severely injured in the incident. The next day, Jimmy threatened to harm all of her family if she tried to take his daughter and leave him. About a week later, Jimmy hit her oldest son, J.F., in the mouth, but claimed it was an accident. Later that evening, Jimmy started choking DeDe in their bedroom. Her son came in and said the bathwater was running over, so Jimmy let her go to take care of the bath. At that point, she fled with her children and called the police.

As a result of these incidents,[4] the Department removed the children from DeDe's custody. Lee Ann Walston, the Department caseworker assigned to DeDe's case, testified that the initial concern of the Department was the domestic violence and DeDe's failed drug test. DeDe tested positive for marihuana and cocaine. At trial, DeDe admitted that she had previously been convicted of burglary, resisting arrest, and possession of marihuana. In addition, she testified that between 2010 and 2014, she had five theft convictions. Among these was a theft she committed while pregnant with her fourth child and for which she was incarcerated for three months shortly after the child was born. DeDe testified that while she was incarcerated for these crimes, her children were separated from each other, staying with various relatives. She asserted that she was never incarcerated for more than two months at a time. DeDe also testified that in the fall of 2014, after the children were removed, she committed a theft in Greenville and one in Rockwall. In

---

[4]In addition to these incidents, there were two previous incidents, in January and March 2014, that the Department investigated. The children were not removed following that investigation.

September 2014, she was arrested for the Rockwall theft and was also arrested in Hunt County for theft and failure to identify. In Hunt County, she was convicted for failure to identify and adjudicated guilty of theft, received sentences of ninety days' and twelve months' incarceration, respectively, and was still incarcerated at the time of trial. DeDe testified that she would be released from confinement approximately two months after the trial date.

DeDe also testified that she began taking "Molly"[5] when she was nineteen or twenty and that she would take Molly in pill form at home while her children were present. She said that Jimmy also used Molly and that they would take the drug together. She claimed that she continued to use Molly into 2014 and would use it twice a month and occasionally on weekends. Although she tested positive for marihuana, DeDe denied smoking it. DeDe associated her problems with law enforcement with her drug use. She also testified that she recognized she had made some very bad choices and that she had been rehabilitated by her current incarceration. DeDe testified that she planned to stay with her sister upon her release, find a job, and then find a house for her children.

Walston testified that J.F. was placed with his paternal grandfather, that J.L. was placed with her paternal grandmother, and that J.N. was placed with her paternal great-grandmother. She also testified that J.E.N was placed with her paternal great-grandmother and that J.H.N. was placed with his paternal aunt and paternal great-grandmother. Walston testified that J.F. was doing well in his placement and that his grandfather had taken him to a doctor, who had prescribed medication

---

[5]"Molly" (slang for molecular) is the popular name for the drug MDMA (3,4-methylenedioxymethamphetamine), which is also known as "ecstasy."

for J.F.'s Attention Deficit Hyperactivity Disorder issues. She stated that he was having issues at school, but that he was receiving individual counseling and was making improvement. She testified that J.F. loved his mother, but had told her he wanted to remain with his grandfather, with whom he had bonded. She said he enjoyed school, knew he would get to see his family, and knew where he would be every day. According to Walston, J.L. was doing well in her placement, although she had behavior problems in school. The Department was trying to get her individual counseling, as well. Walston testified that when J.N. was removed, she was not as verbal as she should have been for her age and was delayed in her development. Since her placement, she had been enrolled in a learning daycare and had made significant improvement. She also testified that J.E.N. was doing very well both at home and at school, and was on target for her age. Walston also stated that J.H.N. was doing very well in his placement and was on target for his age.

Walston also testified that all of the siblings see each other on a regular basis and that all of the placement relatives have each other's telephone numbers so the children can maintain telephone contact. She was confident that the children would maintain contact in the future. Walston testified that all of the children were with family members, were very well cared for, had structure and a stable home life, and are thriving in their placements.

Walston also interviewed DeDe's relatives regarding her past incarcerations and expressed concern that DeDe's repeated incarcerations led to instability in the children's lives. These relatives informed her that in the past, they had kept the children for significant amounts of time, ranging from days to months. Walston was also of the opinion, based on her interviews with DeDe, that DeDe had not completely taken responsibility for her actions that led to the Department's

10

involvement. In Walston's opinion, termination would give stability to the children and enable them to be adopted by their relatives, which would make them eligible for an adoption subsidy, Medicaid, and college assistance. Walston acknowledged that if the children remained in managing conservatorship and DeDe's parental rights were not terminated, the children would remain in limbo.

On cross-examination, Walston acknowledged that during the January and March 2014 incidents, the Department described DeDe as a protective parent and that she was apparently taking care of her children's needs. She also acknowledged that the children were separated in their placements, but pointed out that they all had paternal half-siblings and that they had contact with them frequently. She said that the placement relatives believed family comes first and wanted to ensure that the children maintained contact with their siblings. Walston also testified that while incarcerated, DeDe had been sending her letters and cards for her children every couple of weeks, which Walston forwarded to the placement relatives. She also testified that although DeDe had told Walston she had been taking classes while incarcerated, she had not given Walston any specifics, and DeDe had not told her where she would live or how she would support her children. Walston testified that she was concerned that if there was not a termination, based on DeDe's criminal history, her children's lives would continue to be disrupted. Walston also expressed the opinion that DeDe's past decisions had compromised the children's safety and well-being, and she was concerned that this would continue in the future.

Patrick Bowman, the Court Appointed Special Advocate (CASA) volunteer assigned for J.F., J.L., and J.N., testified that he observed one of DeDe's visits with the children before her

11

incarceration. He observed that she loved the children and that they loved her. He testified that J.F. was well bonded with his grandfather, was involved in youth sports, and was well adjusted at home. In his opinion, the placement had been beneficial to J.F. Bowman testified that J.L. was also doing very well and was living with her grandmother, great-grandmother, and aunt. He said that she had a problem controlling her emotions and that they were trying to get counseling to address this problem. According to Bowman, J.N. was doing very well, received a lot of attention from his grandmother and aunt, and was developing well. He testified that the children had bonded with the placement relatives and their immediate family, that they had had stability, and that he believed this should continue. He believed that the children would continue to grow and prosper in their current environment and that termination was in their best interests. He testified that in the time he had known DeDe, she had not made good choices for her children. He was also concerned that the children would be exposed to her drug use if returned to her. He opined that her poor decisions exposed the children to domestic violence. Bowman said that the relatives the children were with now were good role models and that the children got together regularly with each other and their extended families. He testified that the children currently had a stable, structured environment in which they received both discipline and love. He believed that while with DeDe, they were getting love, but also a lot of bad examples that affected their emotional stability.

Shiloh Whitaker, a case manager for CASA, had direct contact with J.E.N. and J.H.N., and supervised the case involving J.F., J.L., and J.N. She expressed her opinion that termination of DeDe's parental rights was in the best interests of all five children. Whitaker testified that she was

12

concerned about DeDe's decision making and who she allowed in the home and that DeDe put her needs above what was best for the children. Even though the children were in separate homes, Whitaker testified that they had stability and structure and that they knew they would be able to remain in contact with each other. She expressed her concerns about DeDe's ability to maintain her sobriety and about the children's continued exposure to domestic violence. She also testified that the placements for J.E.N and J.H.N. provided them with a stable home environment and emotional stability, and that based on what she had seen during this case, DeDe cannot provide emotional stability.

Adrian, DeDe's sister, testified on behalf of DeDe. She testified that DeDe was a good mother, had always been nurturing and caring, and had provided for her children's needs. She testified that when DeDe was incarcerated, the children stayed with various relatives, but always went back to her when she was released. She said that she talked to all of the children and that she believed they should remain with their placement relatives until DeDe could prove that she could take care of them by getting a job, going back to school, and providing a home for them. On cross-examination, she agreed that some of the decisions DeDe has made put her children in danger at times and that DeDe's choosing to break the law had affected the children. She also acknowledged that if the children were returned to DeDe and she did not change, one of them could be seriously injured. Adrian testified that DeDe planned to stay with her when she got out jail.

DeDe's father, Keith, also testified on her behalf. He agreed that DeDe should prove that she could make the right decisions based on what was best for her children before the children were returned to her. Although he believed DeDe was a good mother and had made positive

13

changes since her incarceration, he testified that she would need additional help after her release before she would be a suitable placement for the children.

The record also shows that in July 2014, after a full adversary hearing, the trial court signed a temporary order appointing the Department as temporary managing conservator of J.F., J.L., and J.N. and appointed DeDe temporary possessory conservator of the children.[6] The temporary order also contained specific actions the trial court required of DeDe to obtain the return of the children. Under the order, DeDe was required (1) to have a court-ordered drug and alcohol dependency assessment completed and follow all recommendations of the assessment; (2) attend counseling sessions as required by the counselor; (3) attend and complete parenting classes and submit a certificate of completion; (4) participate in the Women in Need domestic violence program; (5) submit to drug testing; (6) abstain from drug or alcohol use; (7) maintain stable, safe, and appropriate housing; (8) refrain from engaging in any criminal activity; and (9) comply with each requirement of the Department's service plan. The Department's service plan, signed by DeDe, contained additional requirements that DeDe attend Narcotic's Anonymous/Alcoholic's Anonymous or Celebrate Recovery classes three hours per week and provide documentation of attendance once a month, and that she enter the Intense Out Patient (IOP) and Supportive Out Patient (SOP) drug treatment programs provided at the Mental Health Mental Retardation Center in Greenville.

---

[6]Although J.E.N and J.H.N. were removed from DeDe's possession at the same time as their siblings, the Petition for Protection, for Conservatorship, and for Termination was not filed in their case until September 16, 2014. The temporary order in their case was entered on September 26, 2014, and contains substantially the same provisions as the temporary order entered in this case.

14

Walston testified that DeDe did not complete the drug and alcohol assessment and that DeDe said she attended a few NA meetings before her incarceration, although DeDe did not provide documentation of her attendance to Walston. She testified that DeDe could satisfy this requirement by attending these meetings while incarcerated, but that DeDe had not provided documentation of attendance while incarcerated, either. Walston testified that DeDe only attended four IOP/SOP sessions. She explained that there were a total of thirty-eight IOP/SOP classes required to address any substance abuse concerns. She also testified that at least twelve sessions in the Women in Need program were required, but that DeDe had not attended any. Although DeDe initially tested positive for the presence of cocaine and marihuana, she did not submit to subsequent random drug tests. However, Walston acknowledged that she had not ordered additional tests after DeDe was incarcerated. Walston also testified that DeDe completed neither of her parenting classes before her incarceration. On cross-examination, Walston acknowledged receiving a certificate of completion for parenting skills and reunification course DeDe took through the Texas Department of Criminal Justice. Walston affirmed that this would satisfy the parenting class requirement. Walston was not aware of any other services that DeDe received while incarcerated. DeDe testified that while incarcerated, she had been taking "Changes" courses, parenting courses, and drug classes. She testified that these had changed her thinking and that now she was focused on the well-being of her children. Walston also testified that DeDe failed to obtain and maintain stable housing and income and failed to refrain from criminal activity.

15

## C.   Analysis

"[C]onduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child.  Drug use and its effect on a parent's life and h[er] ability to parent may establish an endangering course of conduct." *In re J.L.B.*, 349 S.W.3d 836, 843 (Tex. App.—Texarkana 2011, no pet.).  In this case, the evidence shows that DeDe's drug use and lifestyle choices created the kind of uncertainty and instability that endangered the physical and emotional well-being of her children.

Specifically, the evidence showed that DeDe began using illegal drugs when she was nineteen and continued using them at least until the children were removed.  Her use of illegal drugs has resulted in an incarceration for possession of marihuana and by her own testimony, a conviction of burglary, a conviction of resisting arrest, and five convictions of theft.  While she was incarcerated for these crimes, DeDe testified, each of her children would stay with different friends and family members.  Although these incarcerations were relatively short in duration, their frequent repetition led to instability in the lives of the children before their removal, endangering their emotional well-being.  All of the witnesses, including those called by DeDe, consistently expressed concern regarding the effect that DeDe's past incarcerations, drug use, and choice of relationships have had on the emotional health of the children.  In addition, DeDe continued her criminal conduct after the children were removed, resulting in even longer incarcerations.  Her continuing criminal conduct further prevented DeDe from establishing a stable home environment after removal.  Finally, the trial court, as fact-finder, could reasonably infer that her relationship with Jimmy was also connected with their shared use of illegal drugs.  This relationship eventually

16

resulted in the children's exposure to domestic violence perpetrated by Jimmy against DeDe and two of her children.

Although the evidence also shows that DeDe sought to leave Jimmy when the abuse began and that she had been viewed as a protective parent by the Department in prior cases, it is the province of the trier of fact to resolve conflicting evidence. *In re Z.M.*, 456 S.W.3d 677, 688 (Tex. App.—Texarkana 2015, no pet.). Based on all the evidence in this case, a rational trier of fact could have reached a firm conviction that DeDe engaged in conduct that endangered the physical and/or emotional well-being of her children. Therefore, we find the evidence legally and factually sufficient to support the trial court's finding under subsection (E). We overrule this point of error.

## II.  Sufficient Evidence Supports the Finding that Termination Is in the Best Interests of the Children

### A.  Standard of Review

To uphold the trial court's ruling, we must determine whether the Department proved, by clear and convincing evidence, that termination of DeDe's parental rights was in the best interests of J.F, J.L., and J.N. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). "There is a strong presumption that a child's best interest is served by maintaining conservatorship in a parent." *A.T.*, 2015 WL 733275, at *5 (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam); *J.L.B.*, 349 S.W.3d at 848. "However, that presumption can be overcome with clear and convincing evidence to the contrary." *Id.* (citing *J.L.B.,* 349 S.W.3d at 848).

Among the factors we may consider in determining the best interest of the children are:

(1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs

17

available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*In re K.S.*, 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.) (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). "It is not necessary to prove all of these factors as a condition precedent to parental-rights termination." *A.T.*, 2015 WL 733275, at \*5 (citing *C.H.*, 89 S.W.3d at 27; *In re N.L.D.*, 412 S.W.3d 810, 819 (Tex. App.—Texarkana 2013, no pet.)). "Evidence relating to a single factor may suffice in a particular situation to support a finding that termination is in the best interest[s] of the child[ren]." *Id.* (citing *K.S.*, 420 S.W.3d at 855 (citing *In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.—Waco 2001, no pet.), *disapproved on other grounds by J.F.C.*, 96 S.W.3d at 267 n.39)). In other cases, however, when the evidence relevant to the *Holley* considerations is scant, it will not support termination of parental rights. *C.H.*, 89 S.W.3d at 27.

"When considering a child's best interest, we may take into account that a parent is unable to provide adequate care for a child, lacks parenting skills, or exercises poor judgment." *A.T.*, 2015 WL 733275, at \*5 (citing *C.A.M.*, 122 S.W.3d at 893). "A parent's drug abuse, which reflects poor judgment, is also a factor that may be considered when determining the child's best interest." *Id.* (citing *In re M.R.*, 243 S.W.3d 807, 820 (Tex. App.—Fort Worth 2007, no pet.). "Further, the amount of contact between the parent and child, the parent's failure to provide financial and emotional support, continuing criminal history, and past performance as a parent are all relevant in determining the child's best interest." *Id.* In addition, "[a] parent's drug use, inability to provide a stable home, and failure to comply with a family service plan support a finding that termination

is in the best interest of the child." *M.R.*, 243 S.W.3d at 821 (citing *In re S.B.*, 207 S.W.3d 877, 883 (Tex. App.—Fort Worth 2006, no pet.)). Finally, the evidence supporting termination under subsection (E) may also be probative of a child's best interest. *See C.H.*, 89 S.W.3d at 28.

### B. Analysis

We will only address those factors set forth in *Holley* for which there is relevant evidence. *See Holley*, 544 S.W.2d at 371–72. Walston testified that J.F. has bonded with his grandfather and has expressed his desire to stay with his grandfather. There is no testimony regarding the wishes of the other children. Therefore, the first *Holley* factor weighs in favor of termination as to J.F., but is neutral as to J.L. and J.N.

The testimony shows that the emotional needs of each of the children are currently being met in their placements, and all indications are that they will continue to be met in the future. Although J.F. had some initial problems, those are being addressed through appropriate medications and counseling. J.L.'s problems are also being addressed. Otherwise, the witnesses all agreed that the children were bonded and happy and that they were receiving the support of their extended families. The uncontradicted testimony was that the children also had frequent contact with each other and that this contact would continue in the future. Although it appears that the children love DeDe and that she did the best she could to provide for them and protect them, the witnesses consistently expressed concern regarding the effects that DeDe's past incarcerations, drug use, and choice of relationships have had on the emotional health of the children. It would not be unreasonable for the trial court, as fact-finder, to infer that the behavioral problems exhibited by J.F. and J.L. and the developmental issues initially exhibited by J.N. resulted from the

19

disruptions and uncertainties stemming from DeDe's choices. Even though DeDe sought to assure the trial court that she had changed and could now make good decisions for her children, none of the witnesses were confident that this was true. Issues of witness credibility are within the province of the fact-finder, and we "'must defer to the [fact-finder]'s determinations, at least so long as those determinations are not . . . unreasonable.'" *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (quoting *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004)). Therefore, the second *Holley* factor weighs heavily in favor of termination as to all three children.

The record shows that DeDe's past decisions also exposed the children to emotional and physical dangers, as well as led to instability in their lives. J.H.N. was subjected to abuse by a man DeDe chose to remain living with after he had begun pushing her and emotionally abusing her. All of the State's witnesses expressed concern that DeDe would continue to make poor decisions regarding drug use, crime, and her relationships in the future. Even DeDe's witnesses, although advocating that DeDe be given a chance to prove herself, were not confident that DeDe would make good decisions going forward. Although she testified that she had learned a lot from the classes she was taking while incarcerated, DeDe offered little evidence demonstrating that she would be able to make good parenting and relationship decisions, refrain from the use of drugs, and refrain from criminal activities in the future. The trial court could reasonably conclude that DeDe's failure to comply with the requirements of the temporary order and her continued criminal activity even after the removal indicated that she would continue to expose the children to emotional and physical dangers. The uncontested testimony showed that the children were happy

20

with their current placements and that they enjoyed a stable family environment. The third and seventh *Holley* factors weigh heavily in favor of termination as to all three children.

Although the testimony was not extensive, the State showed that the current placement relatives were providing for the educational, developmental, physical, and emotional needs of the children; that they were providing a stable, loving home; and that they were providing appropriate discipline. In addition, the testimony showed that these relatives recognized and were committed to meeting the needs of the children to have continuing relationships with each other and the rest of their extended families. All of this reflects positively on their parental abilities. The testimony also showed that DeDe was a loving, protective mother who provided as best she could for the needs of her children. It appears that DeDe also completed the required parenting class while she was incarcerated. However, she provided no testimony regarding anything she learned or how she would change her parenting style. This factor also weighs in favor of termination as to all of the children.

Finally, DeDe's admitted past drug use in the presence her children, her past criminal activities, her continued criminal activities after the removal of the children, and her failure to comply with the trial court's temporary order and the family service plan all support the trial court's finding that termination is in the best interests of the children. *See M.R.*, 243 S.W.3d at 821; *C.H.*, 89 S.W.3d at 28. We find that there is legally and factually sufficient evidence to support the trial court's finding that termination is in the best interests of J.F., J.L., and J.N., and overrule this point of error.

21

We affirm the judgment of the trial court.


Ralph K. Burgess
Justice

Date Submitted:     September 30, 2015
Date Decided:       November 19, 2015